Whxtakee, Judge,
delivered the opinion of tbie court:
Plaintiff sues for salary due from July 19, 1955, to date, which he claims is due him by reason of his alleged unlawful discharge. He was discharged on the ground that he refused to accept reassignment from his position as State Director of the Farmers Home Administration for the State of Wisconsin, a position which he had held since 1946, to a position as special assistant to the Administrator of the Farmers Home Administration in Washington. Plaintiff says his reassignment was for political reasons and not to promote the good of the service, and, hence, his discharge, based on his refusal to accept reassignment, was unlawful.
In our former opinion, 145 Ct. Cl. 632, 636, on plaintiff’s and defendant’s motions for summary judgment, we said:
If the order of reassignment was issued to serve political purposes and not to promote the good of the service, it was an unlawful order. Cf. Knotts v. United States, 128 C. Cls. 489. Being unlawful, it did not have to be obeyed. Hence, a refusal to obey was not insubordination.
Whereupon, we referred the case to a Trial Commissioner to determine whether or not plaintiff’s reassignment was motivated by political considerations. The case is now before us on the Commissioner’s report, and briefs and argument of counsel.
The Commissioner finds that the evidence did not show that plaintiff’s discharge was motivated by political considerations. After careful review of the evidence, we have come to the conclusion that the Commissioner is correct, and that the proof does not show that it was done for reasons other than the good of the service.
*409 The first action, in point of time that has any connection with plaintiff’s discharge was the recommendation of the Department of Agriculture that the positions of Director of the Farmers Home Administration in the several States be excepted from the competitive service. The reason assigned was that the unusual qualifications demanded by the duties of the positions made it difficult to secure the right men by competitive examinations. We must assume that the reason assigned was bona fide, especially because the Civil Service Commission approved the recommendation. To say the least, the action was not particularly aimed at plaintiff because it applied to all State directors.
Plaintiff was notified of the change in the classification of his position on October 30, 1953, but he was advised that he would retain his status in the competitive service. However, on December 15, 1953, the District Court for the District of Columbia held that the holder of such a position did not retain his competitive status. Following this decision plaintiff was notified that he no longer held competitive status.
However, on July 16, 1954, the Court of Appeals of the District of Columbia reversed the District court, and the Supreme Court denied certiorari. Then on January 24, 1955, the Civil Service Commission advised all agencies that such employees did retain their competitive status. Plaintiff was not advised of this, however, and he took an appeal to the Civil Service Commission from the action of the agency notifying him he no longer had status in the competitive service. He was later, on May 18, 1955, given formal notice by the Farmers Home Administration that he did retain his competitive status.
There is nothing in the foregoing that has any bearing on whether or not political considerations motivated plaintiff’s discharge, but it is recited as background for what follows, to show the atmosphere in which the following events took place.
During 1953 and 1954 Farmers Home Administration (hereinafter referred to as FHA) desired to depart somewhat from its policy of making loans itself and, instead, to encourage the' making of private loans, to be insured by *410 FHA. When plaintiff was in Washington in December 1954 Mr. Henry Smith, the Deputy Administrator of FHA, explained this policy to plaintiff. Plaintiff vehemently disagreed with it and told Mr. Smith that the national office should “keep its nose out of the State of Wisconsin” and that he would handle operations in that State. This was relayed to the Administrator. In the same month the Administrator wrote the senior Senator from Wisconsin asking him to suggest a replacement for plaintiff as State Director.
Whether plaintiff’s comment on the policy of the national office and his contumacy in refusing to go along with it was the cause of the Administrator’s decision to remove plaintiff, we do not know — the Administrator was not called as a witness — but it is significant that his letter to the senior Senator followed shortly thereafter.
This defiance of his superiors would have justified the Administrator in removing him, and it was probably the reason for it. That it was followed by a letter to the senior Senator from plaintiff’s State, asking for a recommendation for his successor, followed in the natural course of events. It does not show that his removal was for political reasons, although politics entered into the appointment of his successor.
It ought to be said at this point that it was not the intention to remove plaintiff from the service, but only from his position as State Director, for on February 2, 1955, the position of special assistant to the Administrator was created, given plaintiff’s grade of GS-13, and on March 17, plaintiff was notified that he had been assigned to this position. He was ordered to report to Washington on May 2,1955.
This was done without prior consultation with plaintiff, which was contrary to the usual practice, especially where employees holding positions comparable to plaintiff’s were involved.
To make matters worse, Senator Wiley, the senior Senator from Wisconsin, on receipt of the Administrator’s letter of December 30, asking for a recommendation for plaintiff’s successor, wrote the Wisconsin national committeeman on the Republican National Committee, and this man wrote the executive secretary of the Republican Party of Wisconsin, *411 notifying him that plaintiff had been transferred and asking him for a recommendation for his successor. The executive secretary of the Party, upon receipt of this letter, called the chairman of the Wisconsin Agricultural Stabilization and Conservation Committee for a recommendation. He, in turn, spoke to plaintiff about the matter, because he felt that plaintiff would be the most qualified person to recommend a successor. This was the first time plaintiff had heard of the pending reassignment.
The administrator’s action was grossly inconsiderate, however outrageous plaintiff’s remark about Washington’s keeping its nose out of Wisconsin’s affairs may have been. But it does not show that it was motivated by political considerations.
After plaintiff heard of his proposed replacement, politics really did play a part in what happened thereafter. Plaintiff then entered the political arena himself. He put on an intensive campaign with people prominent in the field of agriculture in Wisconsin, and with the Wisconsin delegation in Congress.
This culminated in a letter from Senator Wiley to the Secretary of Agriculture, dated June 10,1955, which read as follows:
I am sorry to note that Mr. Tom Schmidt is no longer Director of the Farmers Home Administration in my State.
My previous endorsement of his qualifications will stand, because grass-roots reports to me have conveyed nothing but good of him.
I do not propose, therefore, to recommend any alternative name to him, and I hope, that although the hour is late so to speak, the matter will be reconsidered and that he will be reassigned to his Wisconsin post.
Not only did the Senator write this letter, but on June 20, 1955, he requested the Assistant Administrator of the FHA, who was in the West on other business, to meet with a group of Wisconsin farm leaders who had been protesting plaintiff’s reassignment, for the purpose of assuring them that the reassignment was entirely an administrative one, made in the interest of the FHA program, that there was a bona -fide job *412 for plaintiff in Washington, and that no outside influences, political or otherwise, were involved in the decision to make the transfer.
However, political influence was not sufficient to dissuade the Administrator of FHA from adhering to his determination to remove plaintiff as the State Director and to bring him to Washington as his special assistant.
As stated above, plaintiff was first ordered to report to Washington on May 2,1955, but he wired the Administrator on the day he was supposed to report as follows: “Cannot accept reassignment appealing action”. As a result of this wire the Assistant Administrator wired him that he was placed on annual leave “pending action recommendation for your separation for inability to accept reassignment.”
He was then given an opportunity to resign, but he ignored the offer.
Charges of insubordination were then preferred against him by the Director of Personnel of the Department of Agriculture. This was on June 2,1955. On July 11,1955, plaintiff submitted a 10-page answer to these charges.
Finally, on July 7, 1955, the Administrator undertook to straighten the matter out by writing plaintiff as follows:
A review of your answer to the letter of charges issued by the Office of Personnel indicates to me you believe the Washington position to which you were reassigned was not a bona fide one. This may have influenced your decision not to accept the transfer.
I definitely feel the need and importance of men on my staff to carry out the functions included in the job which you were reassigned. With the added responsibilities assigned to the Agency recently by the Congress and additional programs now being proposed, it is more imperative than ever for men with your experience and background be available on my staff in Washington.
With the assurance contained in this letter that the position here is bona fide, the thought occurred to me that you might wish to reconsider and accept. If you do, please let me know not later than July 15, 1955. I feel this assignment will offer a real challenge to you which you will enjoy meeting.
On July IB, 1955, plaintiff wrote the Administrator a letter which reads in part as follows:
*413 I would like very muck to consider your cordial invitation to reconsider my reassignment to a position on your staff; however, on June 2, 1955 the Director of Personnel, Mr. MacHenry Schafer, charged me with insubordination for failure to report to Washington on May 2, 1955. This charge was answered on June 11, 1955. I consider the charge of insubordination most severe and without foundation in view of all the facts and until such time as a decision is rendered, I have no alternative but to withhold making any decision in regard to your proposal of July 7, 1955. I am confident that the Department of Agriculture will render a fair and impartial decision in my case after they have investigated all the facts.
I deeply regret that I have not been afforded an invitation to meet with you and other officials in the Department of Agriculture, particularly in view of the expression of my willingness for such a meeting as transmitted to the Secretary of Agriculture by Mr. Milo K. Swanton on July 5, 1955. It is my belief that until confidence and understandings have been restored through a personal meeting no mutually satisfactory settlement is in prospect.
On the following day the Administrator wired plaintiff as follows:
Eeurlet July 13 Department officials informed me today final decision regarding charges being withheld until close of business July 15 to provide you an opportunity to reconsider per my letter of July 7.
On July 15, 1955, the Director of Credit Services of the Department of Agriculture, the superior of the Administrator of FHA, determined that the charge against plaintiff was sustained and that the efficiency of the service would be promoted by plaintiff’s separation. Plaintiff was advised of this by telegram of July 18,1955, and a copy of the decision was mailed to him the same day.
Plaintiff took an appeal to the Civil Service Commission, but the Regional Director wrote plaintiff a letter in which he said:
The contents of your letter of July 27 have been given every consideration, and it is the conclusion of this office that you have not established a prima facie case that your separation was effected for political reasons.
*414 The Board of Appeals and Review of tbe Civil Service Commission affirmed this action.
We are of opinion that the evidence fails to show that plaintiff’s reassignment to a position in Washington, the refusal to accept which was the reason for his separation, was motivated by political considerations.
The Administrator assured plaintiff in his letter of July 7 that the position to which he proposed to reassign him was a bona fide one, and he urged him to accept it. We cannot say that this letter was not written in good faith. If it was, the action taken was that action which the Administrator thought was for the good of the service.
From all of this it results that plaintiff is not entitled to recover and his petition must be dismissed.
It is so ordered.
LaRamoke, Judge; Madden, Judge; and JoNes, Chief Judge, concur.
Dhreee, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Yance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was appointed State Director of the Farmers Home Administration for the State of Wisconsin shortly after August 19,1946. Effective May 14,1947, his position, which had been in an excepted status, was converted to competitive status. He had originally been employed in a predecessor agency about 1934.
2. Farmers Home Administration (hereinafter referred to as “FHA”) was established pursuant to the Bankhead-Jones Farm Tenant Act of July 22, 1937 (50 Stat. 522), as amended (7 U.S.C. 1000-1040). It was organized to make or insure loans for the purchase of farms (7 U.S.C. 1001-1006e), and to make loans to farmers and stockmen for operating expenses (7 U.S.C. 1007-1009).
3. On August 11, 1953, the Department of Agriculture recommended to the Civil Service Commission that the posi *415 tions of state director in FHA. in tbe several States be excepted from tbe competitive service and placed in Schedule A. It was argued that due to tbe unusual qualifications required by tbe position it was difficult to fill such positions by competitive examination. On October 27,1953, the Civil Service Commission approved this request. Under date of November 3,1953, the personnel officer of FHA was directed to prepare a Form 50 for each incumbent, advising him of this transfer of position, but also advising the incumbent that since he had competitive status, he would remain in the competitive service despite the change in the position. Such a notice was sent to plaintiff, effective as of October 30,1953.
4. Following the decision of the District Court in Both v. Brownell, 117 F. Supp. 362, the Civil Service Commission decided that employees holding competitive status whose positions were excepted from such status, thereby lost their competitive status. Plaintiff was accordingly sent a notice dated April 21, 1954, but effective as of October 30, 1953, advising him that his tenure was “indefinite.”
The decision in the Both case was reversed by the Court of Appeals (215 F. 2d 500), and the Supreme Court denied a petition for certiorari (348 U.S. 863). Pursuant to this determination the Civil Service Commission advised all agencies on January 24, 1955, by Department Circular No. 789 that employees having competitive status retained that status even though their positions were excepted. Said Circular No. 789 contained the following:

Appeals

12. The decision and determinations reflected above mean that certain adverse actions involving persons identified in paragraph 6 above, effected since June 25, 1953 without compliance with the Lloyd-LaFollette Act and Part 9 of the Civil Service Regulations, were improper. Persons alleging such adverse action may appeal to the Appeals Examining Office in the Central Office of the Civil Service Commission within 90 days from the date of this circular. (Appeals filed directly with agencies within the above time limit will be construed as having been filed on time.)
Plaintiff had received a Form 50 advising him of the previous changes in his competitive status. Since he re *416 ceived no Form 50 advising him of his restoration to competitive status he resorted to the appeal procedure outlined above. On May 16, 1955, after plaintiff had been put on annual leave as hereinafter recited, the Civil Service Commission advised him by letter that no action warranting an appeal had been taken against him and that therefore he had no grounds for appeal. Nevertheless, 2 days later, on May 18, a revised Form 50 was given him by FHA, recognizing his competitive status.
5. During the 1953-1954 period, there had been a change in emphasis in FHA, in the sense that greater stress was placed upon the use of FHA-insured loans, rather than direct loans of Government funds. In some states considerable difficulty had been experienced in securing the cooperation of local lending institutions, and the National Office of FHA had accordingly made arrangements with certain national lenders to make a line of credit available for these insured loans. However, it was desirable, when such a commitment was made, that it be filled as rapidly as possible, so that the lending institution would not have idle funds for too long a period.
This policy was explained to plaintiff during a trip which he made to the Washington office in about December 1954. Plaintiff’s response was, in substance, that the national office should “keep its nose out of the State of Wisconsin”, that plaintiff would handle operations in Wisconsin and that the national office could run the rest of the country.
It can be reasonably inferred that a clash of personalities between the Administrator of FHA and plaintiff grew out of the Administrator’s wish to make use of the lending sources which the national headquarters had developed, while plaintiff was averse to taking such business away from local sources he had been singularly successful in developing.
6. Plaintiff’s attitude was communicated to the Administrator of FHA. In spite of the difference of opinion on the loan policy of the FHA, because of plaintiff’s high degree of success in securing the participation of local lending institutions in the insured program, the Administrator was of the opinion that plaintiff, were he willing to cooperate, could become a valuable member of the Washington staff, *417 where he would be available to advise other state directors as to the methods he had used.
7. Under date of December 30, 1954, the Administrator of FHA addressed a letter to the senior Senator from Wisconsin. So far as here material, that letter read as follows:
This will confirm our conversation of December 29, regarding the selection of a man from your state to act as State Director for the Farmers Home Administration. This position is a grade GS-13 with a starting salary, of $8,360 per year. It is not necessary that this position be filled by someone on the Civil Service Register as it is under Schedule A. The party or parties that you recommend should briefly have the following qualifications:
1. Good character and reputation.
2. Business experience (not necessarily owner, but of executive ability). .
3. Knowledge of farming and farm problems.
4. Knowledge of lending, either from banking or other experience.
5. Age — preferably between forty and fifty years. (Job very strenuous, considerable travel, maturity of judgment and ability to take long hours.)
6. Ability to meet people publicly and privately. Good soundness in thinking.
7. Good education, not necessarily college degree. High school graduate with business experience and supplemental education, either correspondence or business courses.
*jí
8. Under date of January 13,1955, the Wisconsin member of the Republican National Committee addressed a letter to the executive secretary of the Republican Party of Wisconsin. This letter read as follows:
The present State Director of the Farmers Home Administration, whose name I have forgotten, has been transferred and the National Committee has requested the two Senators for a recommendation for this position, sending me a copy of the letter to the Senators. I think you should consult with Bill Merriam so we can come up with a name as soon as possible.
9. On receipt of this letter, the executive secretary called the chairman of the Wisconsin Agricultural Stabilization and Conservation Committee, to ask that official for recommenda *418 tions. That official spoke to plaintiff about this information, because be felt tbat plaintiff would be in tlie best position to recommend a successor in this technical field. Plaintiff had had no prior knowledge of his impending reassignment. After some discussion, plaintiff asked for an opportunity to discuss the matter with the executive secretary of the Republican Party, and two representatives of the ASC Committee accompanied plaintiff to that official’s office. Without showing plaintiff the letter he had received, he conveyed to plaintiff the substance of it, and advised plaintiff that if he did not want to be transferred to Washington, he should see his friends.
10. Following this, plaintiff did discuss his possible reassignment with a number of his friends, including Milo Swanton, the Executive Secretary of the Wisconsin Council of Agricultural Cooperatives; the Dean and Associate Dean of the University of Wisconsin College of Agriculture; the chairman of the ASC Committee; and the Director of the Wisconsin Department of Agriculture. Plaintiff also saw the former State Republican Chairman, and the Wisconsin member of the Republican National Committee. There is no evidence that the last two took any action on plaintiff’s behalf, but the others wrote letters or made personal visits to officials of the Department of Agriculture, from the Secretary down, and to the Wisconsin delegation in Congress, in an attempt to secure plaintiff’s retention as State Director.
11. A position as special assistant to the Administrator of FHA, at the same GS-13 grade which plaintiff then held as state director, was established on February 2, 1955. A formal memorandum to effect plaintiff’s reassignment was started in its processing on February 16,1955. This required the approval of the Director of Credit Services of the Department of Agriculture. Because of the numerous communications which had been received on plaintiff’s behalf, that official made thorough inquiry of the FHA Administrator and members of his staff, as to the reasons for the transfer, and as to the tona fides of the position available for plaintiff in Washington. He eventually approved the transfer about March 8,1955.
*419 12. Under date of March 17, 1955, plaintiff was advised of his reassignment to the Washington office of FHA. This letter read as follows:
For administrative reasons we are reassigning yon to a position in the Washington Office as Special Assistant to the Administrator at your present grade and salary. For more detailed information, a copy of the job description is attached.
This position is in the competitive service. The reassignment which is effective May 1, with a reporting date of May 2, is being taken in accordance with the competitive Civil Service rules and regulations.
Your household goods and family will be moved to Washington at Government expense.
Both as a matter of courtesy and as a matter of good personnel relations it was the practice of FHA to have a personal interview with an official whose reassignment was desired, in order to obtain his views on the reassignment, and to insure a satisfactory relationship should such reassignment be accomplished. This was not done in this case.
13. Plaintiff’s annual performance rating was due to be made as of March 31, 1955. The Deputy Administrator of FHA had been delegated authority to rate the state directors. This rating was required to be discussed with the individuals rated. However, in the case of the state directors, it had been customary to mail them the rating forms, to be signed by them if they agreed with the rating. If they disagreed, or desired to discuss the rating, they could come into the Washington office for such discussion, either then or in connection with their next trip. Plaintiff’s rating, listing his performance as “Satisfactory,” as it had been rated at least the five preceding years, was prepared as of about March 31, 1955. However, because of the ordered reassignment to Washington it was not mailed to him but was held in Washington to be discussed with him on his arrival. This rating, never having been signed by plaintiff, has not become an official rating of him.
14. Under date of April 8, 1955, plaintiff replied to the notice of his reassignment. In his letter plaintiff stated:
This will acknowledge your letter of March 17, 1955. Considering the very fine acceptance of the program under my leadership, the most excellent support that has *420 been afforded me, and for personal and family reasons, I would sincerely appreciate your reconsidering my being retained in Wisconsin as State Director.
During this period of time plaintiff bad a travel authorization which permitted travel to and from Washington at his will. However, it was not customary for a state director to come to Washington without a definite appointment or knowledge that the person to be seen was available.
15. Under date of April 27,19S5, the Assistant Administrator of FHA replied to plaintiff’s letter. So far as here material, his letter states:
Our initial decision was made after careful consideration. While we can understand your desire to remain in your present position, we must reaffirm our decision that your services can be better utilized in the National Office position to which you have been reassigned effective May 1,1955.
16. Under date of April 29,1955, plaintiff wired FHA as follows:
Cannot accept reassignment. Appealing action.
This telegram was received in Washington on May 2,1955, the day plaintiff was supposed to report for duty. On the afternoon of the same day, the Assistant Administrator of FHA wired plaintiff as follows:
You are by direction of the administrator hereby placed on annual leave effective immediately pending action recommendation for your separation for inability to accept reassignment.
17. Under date of May 6, 1955, the Administrator of FHA wrote to plaintiff, referring to plaintiff’s refusal to accept his reassignment. In this letter he offered plaintiff the opportunity to resign his position, if he preferred this to a recommendation that he be removed on charges. Said letter contained the following paragraph:
If you elect to resign, your resignation must be received and be effective within five days of your receipt of this letter, except that if the effective date would be set by this office at any later date which would permit the use of any annual leave which could not be paid in a lump sum. If your resignation is received within this *421 period, the records will show that you resigned to avoid a recommendation that removal charges be preferred against you for refusal to accept a transfer.
As no reply was received, charges of insubordination were preferred against plaintiff by the Director of Personnel of the Department of Agriculture on June 2,1955.
18. Plaintiff submitted a 10-page answer to these charges on June 11, 1955. While this was under consideration, the Administrator of FHA wrote plaintiff under date of July 7, 1955, as follows:
A review of your answer to the letter of charges issued by the Office of Personnel indicates to me you believe the Washington position to which you were reassigned was not a bona fide one. This may have influenced your decision not to accept the transfer.
I definitely feel the need and importance of men on my staff to carry out the functions included in the job which you were reassigned. With the added responsibilities assigned to the Agency recently by the Congress and additional programs now being proposed, it is more imperative than ever for men with your experience and background be available on my staff in Washington.
With the assurance contained in this letter that the position here is bona fide, the thought occurred to me that you might wish to reconsider and accept. If you do, please let me know not later than July 15, 1955. I feel this assignment will offer a real challenge to you which you will enjoy meeting.
19. Throughout the intervening period, there had continued to be a barrage of letters, personal visits and telephone calls on plaintiff’s behalf. Under date of June 10, 1955, the senior Senator from Wisconsin wrote to the Secretary of Agriculture, as follows:
I am sorry to note that Mr. Tom Schmidt is no longer Director of the Farmers Home Administration in my State.
My previous endorsement of his qualifications will stand, because grass-roots reports to me have conveyed nothing but good of him.
I do not propose, therefore, to recommend any alternative name to him, and I hope, that although the hour is late so to speak, the matter will be reconsidered and that he will be reassigned to his Wisconsin post.
*422 Under date of July 5, 1955, Milo Swanton, who bad discussed the case personally with the Secretary of Agriculture, wrote to that official as follows:
Complying with your suggestion, when I got back to Madison I conferred with Tom Schmidt and found that he would be willing to come to Washington to discuss the Farmers Home Administration matter if you people would like him to do so. He is willing to come at such time as would be most convenient for you people.
By letter of July 8, 1955, the Director of Credit Services of the Department of Agriculture, who was going to have to render a decision on these charges, replied to Mr. Swanton as follows:
We are pleased to get your letter of July 5 reporting that you had talked with Tom Schmidt, who expressed a willingness to come to Washington to discuss the FHA matter.
Since you were here, Bob McLeaish and I have discussed this matter further. Bob has written to Mr. Schmidt and, I believe, sent a copy to you. The purpose of the letter was to assure him that the offer of a position on the FHA staff here was a bona fide offer and to give him another opportunity to accept the position. I am confident that it is a bona fide offer. I believe that if Mr. Schmidt accepts the position, Bob McLeaish and his associates will cooperate fully with him in carrying out his new responsibilities. If Mr. Schmidt comes in with a determination to be a full-fledged member of the team, I believe he will find that Bob McLeaish and the others with whom he will be working will show the same determination to make this a successful arrangement.
I hope that Mr. Schmidt decides to accept the offer. If he declines, we will need to terminate his services without further delay. I believe Mr. McLeaish’s letter informed Mr. Schmidt that the position here could not be held open for him beyond July 15. That will be my last day here in the office before a trip West on business and vacation. If Mr. Schmidt arrives next week, I will be glad to join Mr. McLeaish and others in talking with him.
Secretary Benson is out of the City today, but a copy of this letter will be brought to his attention. I know he will appreciate learning of your further dis *423 cussion with Mr. Schmidt. We all recognize your sincere desire to have the affairs of the Department handled in the best interests of Agriculture.
20. On June 20, at the request of the senior Senator from Wisconsin, the Assistant Administrator of FHA, who was in the West on other business, met with a group of Wisconsin farm leaders who had been protesting plaintiff’s reassignment. He stated to them that the decision to make the reassignment was entirely an administrative one, made in the interest of the FHA program, that there was a bona fide job for plaintiff in Washington, and that no outside influences, political or otherwise, were involved in the decision to make the transfer.
Following this conference, the Director of the Wisconsin Department of Agriculture saw the Administrator of FHA in Washington, and repeated the statement that the farm leaders of Wisconsin desired that plaintiff be retained there.
21. Plaintiff never came to Washington to discuss this matter with any official of FHA or of the Department of Agriculture. Under date of July 13, 1955, he wrote to the Administrator of FHA as follows:
I would like very much to consider your cordial invitation to reconsider my reassignment to a position on your staff; however, on June 2, 1955 the Director of Personnel, Mr. MacHenry Schafer, charged me with insubordination for failure to report to Washington on May 2, 1955. This charge was answered on June 11, 1955. I consider the charge of insubordination most severe and without foundation in view of all the facts and until such time as a decision is rendered, I have no alternative but to withhold making any decision in regard to your proposal of July 7, 1955. I am confident that the Department of Agriculture will render a fair and impartial decision in my case after they have investigated all the facts.
I deeply regret that I have not been afforded an invitation to meet with you and other officials in the Department of Agriculture, particularly in view of the expression of my willingness for such a meeting as transmitted to the Secretary of Agriculture by Mr. Milo K. Swanton on July 5, 1955. It is my belief that until confidence and understandings have been restored through a per *424 sonal meeting no mutually satisfactory settlement is in prospect.
*****
On the following day the Administrator of FHA wired plaintiff as follows:
Eeurlet July 13 Department officials informed me today final decision regarding charges being withheld until close of business July 15 to provide you an opportunity to reconsider per my letter of July 7.
22. On July 15, 1955, the Director of Credit Services of the Department of Agriculture determined that the charge against plaintiff was sustained and that the efficiency of the service would be promoted by plaintiff’s separation. Plaintiff was advised of this by telegram of July 18, 1955, and a copy of the decision was mailed to him the same day.
23. Plaintiff thereupon took an appeal to the Seventh Civil Service Eegion, contending that the attempted reassignment of him “meant that it was the desire and ultimate aim to appoint a Schedule A employee recommended by the Eepublican Party, or frankly to create a patronage position. On September 28,1955, the Eegional Director of the Seventh Civil Service Eegion replied, pointing out that, except in cases involving veterans, the Commission did not investigate or review the sufficiency of the reasons for the removal of an employee, unless “a prima facie case is established that either the procedures prescribed by the Commission under Section 9.102(a) (1) have not been followed or that the removal, suspension, reassignment or demotion was made for political reasons, etc.” This letter then continued:
The contents of your letter of July 27 have been given every consideration, and it is the conclusion of this office that you have not established a prima facie case that your separation was effected for political reasons.
24. Plaintiff appealed this decision to the Board of Appeals and Eeview of the Civil Service Commission, which on April 4,1956, affirmed the action of the Seventh Eegion.
25. No recommendation for plaintiff’s replacement was ever made by the Eepublican Party or by any Eepublican official or office-holder. Plaintiff was in fact succeeded by the man who had been his assistant as state director.
*425 26. Since the termination of his service by FHA, plaintiff ha.q had no other employment, and has sought none. He has lived partly on his savings and partly on moneys advanced by his father.
27. The removal of the position of state director of FHA from the competitive Civil Service and the placing of it in Schedule A, may suggest the desire to use appointments to this position for political purposes. However, the proof in this case does not substantiate the fact that plaintiff’s reassignment to Washington was primarily to make his position in Wisconsin available for political appointment.
The cavalier treatment of plaintiff in ordering his reassignment, without prior personal consultation; the summary order to him to report in Washington on May 2, delivered to him the previous April 29; the failure to provide the necessary documents for the transfer of his family and effects; and the prompt resort to charges of insubordination, upon his failure to accept the reassignment point rather to a feeling by the Administrator that plaintiff could no longer operate effectively as a state director; a desire on such Administrator’s part to remove him from the position of state director in Wisconsin, and an indifference as to whether plaintiff came to Washington or resigned.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and his petition is therefore dismissed.